**MUELLER v. POWELL et al.**
No. 432.

United States District Court
W. D. Missouri, Central D.
June 4, 1952.

Victor B. Harris (of Smith, Harris & Hanke), St. Louis, Mo., James T. Blair, Jr., Jefferson City, Mo., for plaintiff.

Don C. Carter, Sturgeon, Mo., R. E. Ausmus and Warren D. Welliver (of Alexander, Ausmus, Harris & Welliver), Co-

lumbia, Mo., William E. Kemp and James P. Tierney (of Kemp, Koontz, Clagett & Norquist), Kansas City, Mo., for defendants Glenn Powell & Julius Wedemier.

William E. Kemp, Elliot Norquist and James P. Tierney (of Kemp, Koontz, Clagett & Norquist), Kansas City, Mo., for defendant M. Stanley Ginn.

REEVES, Chief Judge.

By this action plaintiff seeks damages for an alleged invasion of his civil rights. He claims that he was deprived of his liberty by the defendants "under color of the authority vested in them by the statutes and regulations of the State of Missouri, * * *."

There are three counts in the complaint. The first count seeks damages perforce the provisions of Section 43, Title 8 U.S.C.A. relating to the subject of Civil Rights. By the second count plaintiff asks damages against the defendants for an alleged conspiracy to deprive him of rights vouchsafed to him by the Fourteenth Amendment to the Constitution of the United States. By the third count of the complaint plaintiff prays damages for an alleged conspiracy covered by Section 47, Title 8 U.S.C.A. relating to the general subject of "Conspiracy to interfere with civil rights."

The several counts of the complaint are based upon an actual arrest of the plaintiff by the defendants as sheriff and deputy-sheriff of Boone County, Missouri, on the evening of May 4, 1950.

In substance the plaintiff charges that, not only was he deprived of a right, namely, his liberty, by actions of the defendants under color of law, but that the defendants had designed by a conspiratorial arrangement to take away from him his liberty and to hold him incommunicado for a period of hours. The question involved is the right to reparation for claimed deprivation of liberty and, remotely, or secondarily, whether the right of the plaintiff is paramount and superior to the right of the public.

The defendants deny the averments of the complaint save only that they were respectively sheriff and deputy sheriff for Boone County, Missouri, at all the times mentioned in the complaint. It is admitted, both in the pleadings and in the testimony, that plaintiff was in fact arrested at the time asserted by him and that he was held a prisoner and interrogated by the defendant Wedemier from the time of his arrest, at approximately 8:30 on the evening of May 4, 1950, at the farm home of said Wedemier six miles distant from Columbia, Missouri, until approximately six o'clock on the morning of May 5th, and thereafter held in custody until 5 o'clock of the same day. During the time he was restrained of his liberty he was interrogated and after breakfast, on May 5th, was taken to Jefferson City, Missouri, some thirty miles distant from Columbia, for the purpose of being subjected to a mechanical lie test. The plaintiff was agreeable to such test, or otherwise it would not have been made. It was inferred from the testimony that the lie test was negative and immediately upon the return to Columbia, the plaintiff was released by the defendants. Shortly thereafter a state action was commenced by plaintiff for false arrest, and depositions were taken in that proceeding. The state action was dismissed and the suit as above described was instituted here. The evidence taken in the state court action, by agreement of the parties, was introduced in the trial here.

The undisputed evidence was that late in the evening of March 18, 1950, at the home of Mr. and Mrs. Romack, residents of Columbia, Missouri, a brutal and horrible ravishment and murder was committed in said home. Mr. and Mrs. Romack were absent at a social affair and had employed one Janet Christman to sit with and attend their baby during their absence. Some time prior to midnight the murderer and ravisher was admitted into the home, with the result that he assaulted the victim, the said Janet Christman, and brutally ravished and murdered her. When the Romacks returned home near midnight they found their baby unharmed and the lifeless and mutilated body of the victim on the floor, with all the incriminating evidence of the struggle preceding the accomplishment of the murderer's purpose. The authorities were promptly notified. A physician was called who made a careful and painstaking ex-

amination of the body and at approximately the same time the enforcement officers, upon notice, came to survey the scene and to gather evidence that might be helpful in pointing the finger of accusation at the offender and apprehending him.

Defendant Wedemier, who had had a long and qualifying experience as a detective and police officer in St. Louis, Missouri, made a careful survey of the scene. He was, of course attended by the defendant Powell, the sheriff. Not only were the premises examined, but all persons who might have had some knowledge of the premises and the facts were interviewed. The victim had been instructed not to admit unknown persons into the home. The telephone was off its hook, a front porch light was burning, and a window had been broken under circumstances which made it clear that same had been done as a ruse. A garden tool, taken from an inner or utility room inside the house, had been used to break the window and had been left on the outside of the house. It was reasonably concluded by every one familiar with the facts, including the defendants, that the crime had been committed by some one who was entirely familiar with the premises and was acquainted with the victim.

By a process of elimination those who were familiar with the interior of the home, as the offender must have been, were reduced to two—Mr. Romack, the head of the house, and the plaintiff. An inquiry concerning the whereabouts of Mr. Romack completely exonerated him. He was present during the whole evening at a social gathering and many persons confirmed his presence there. According to the statements, as well as the testimony of the Romacks, (that is Mr. Robert Edward Romack and Mrs. Ann Romack) the plaintiff was entirely familiar with the interior of the home and was acquainted with the victim; in fact she had sat as an attendant on other occasions for a child of the plaintiff and his wife. Plaintiff and the Romacks were intimate friends. This close friendship had grown out of a comradeship between the plaintiff and Mr. Romack during the school years and the late war. Many instances occurring during the association of plaintiff and the Romacks caused the Romacks to suspect plaintiff as the offender and perpetrator of the crime. It seemed obvious to them, as well as to the enforcement officers, that entry to the home had been attained by or granted to some one recognized by the murdered girl. The plaintiff had been in the home many times and in the various rooms of the home. He was familiar with the location of many articles, including the cord found about the neck of the victim and which was used to accomplish her death. Mrs. Romack was positive in her assertions that the plaintiff was the author of the crime. She based this conclusion on the fact that the plaintiff was not only familiar with the interior of the premises but that on more than one occasion he had made lustful advances toward her and had sought to take liberties clear out of line with the proprieties and had done things in her presence and in the presence of others which caused her to characterize him as being over-sexed. Moreover, to Mr. Romack, he had on occasion made comments about the victim, her figure, and appearance, as well as her development, all of which was along lustful and licentious lines. The plaintiff customarily carried a mechanical pencil, and on occasions of tension or stress, or excitement, he nervously manipulated the pencil, and it appeared from the wounds of the victim that many of them, especially those upon her face and temple, were made by an instrument corresponding in many details with the pencil carried by the plaintiff. Furthermore, on the morning following the crime plaintiff called the Romacks' home to tender his assistance in "cleaning up the mess." The public had not been advised that there was a "mess" although it had been informed of the murder.

When the murder was committed the evidence indicated that the struggle of the victim for her life and her virtue had been carried on from room to room as blood was found in many places. A footprint was discerned which corresponded in some particulars with the possible footprint of the plaintiff.

To Mr. Romack, the plaintiff had said that on the night of the crime he was driv-

ing around and that he had no alibi save only that he had no scratch marks.

All of the above, and other matters not necessary here to mention, imparted to the defendants caused them, as enforcement officers, to suspect the plaintiff as the perpetrator of the horrible crime.

The inquiry of the defendants had extended through April for the reason that Mrs. Romack, because of her physical condition and the horrible experience through which she had passed, had gone to California and it was necessary for the defendant Wedemier to go to California to interview her. Because of the wounds on the face of the victim, some of which had apparently been inflicted by an instrument of the type of a pencil, and because of the conspicuous use that the plaintiff had made of his pencil, the sheriff and deputy desired to arrest him at a time when he had on his person and in his possession the pencil above mentioned. Being advised on the evening of the arrest that the plaintiff had such pencil on his person, with the aid of Mr. Romack, who had suggested a social function to the plaintiff, the defendants, outside the home of the plaintiff, arrested him and transferred him to the residence of the defendant Wedemier, six miles out of Columbia, where, as heretofore stated, sporadically and admittedly the plaintiff was questioned until daybreak of May 5th. During that time he was not denied the right to use the telephone, was given refreshments, and part of the time was spent in visiting and social conversation. The defendants say that questioning was prolonged for the reason that the plaintiff was not frank or truthful in his answers and before daylight admitted that he had not been truthful in relation to many answers returned by him. Such was denied by plaintiff. The object, as testified by the defendants, in taking the plaintiff to the farm home of the defendant Wedemier, was to avoid publicity and that this was both in the interest of plaintiff as well as the public in their effort to solve a gruesome murder.

It is unnecessary to state other details disclosed by the testimony. The question is the fundamental one, whether the defend-ants unjustifiably arrested the plaintiff and whether such arrest was designed by them to deprive plaintiff of his liberty.

1. Under the Missouri law, and particularly by Section 544.210 RSMo 1949, V.A.M.S., "An arrest may be made on any day or at any time of the day or night." And, by a preceding section, namely 544.-170, it is provided that all persons arrested "without warrant or other process * * on suspicion (emphasis mine) * * * shall be discharged from said custody within twenty hours from the time of such arrest, * * *."

It is obvious from these statutory provisions that an enforcement officer, whose duties as are those of the sheriff and his deputies, is empowered to make an arrest either day or night without warrant or process and to hold the suspect for not more than twenty hours.

It is to be further noticed that, by section 57.100 RSMo 1949, V.A.M.S., the duties of the sheriff, among other things, are to "apprehend and commit to jail all felons * * *."

2. Without specifically pointing out the statutory provisions which enjoin under penalty upon sheriffs and similar officers faithfully to perform their duties, it is sufficient to say that, as said by the Supreme Court in State v. Nolan, 354 Mo. 980, 192 S.W.2d 1016, 1020, loc. cit. 1020:

"In a republic like ours, the citizens are sovereign. At common law and by statute sheriffs, constables, and other like officers are required to discharge their official duties—protect the sovereign—under penalties. The execution of legal processes and the discharge of legal obligations give life to the law; and resistance thereto is in opposition to the law * * *. The security of the people as well as the dignity of the law requires officers, in making arrests, to overcome flight and resistance and place the person under physical restraint, especially felons. This duty is accomplished by pressing forward. (Emphasis mine). It is not discharged by defensive action. Officers are the aggressors. They 'would

be of all men the most miserable' if while effecting lawful arrests they be placed on the same level as ordinary individuals having a private quarrel and be denied that protection commensurate with the public duty exacted."

The court further said, 192 S.W.2d loc. cit. 1021:

"*Furthermore, the presumption is that peace officers are in the lawful discharge of their duty in attempting to make arrests.*" (Emphasis mine.)

See also Maxwell v. Andrew County, 347 Mo. 156, 146 S.W.2d 621, loc. cit. 625.

■ 3. It is the rule without exception that enforcement or peace officers, such as the defendants, may make arrests at any time, day or night, if they have reasonable and probable grounds of suspicion, and that this may be done without a warrant or capias. 6 C.J.S., Arrest, § 6(d), page 596. And the true doctrine is that:

"Where an officer, in good faith, believes that a person is guilty of a felony, and his belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise, he has such probable cause for his belief as will justify him in arresting without a warrant."

This principle is supported by a wealth of authorities, including Wisniewski v. United States, 6 Cir., 47 F.2d 825, and State v. Williams, 14 S.W.2d 434, loc. cit. 435, where the Supreme Court of Missouri said:

"A peace officer may arrest without a warrant any one who he has reasonable grounds to believe has committed a felony. * * *

"But an officer has a right to *arrest* without a warrant on reasonable ground to suspect that the person arrested has committed a felony. * *."

And, in the case of State v. Padgett, 316 Mo. 179, 289 S.W. 954, 956, loc. cit. 956, the Missouri Supreme Court announced the doctrine that the legality of an arrest "is to be determined by the facts and circumstances attending the same * * *." And the Federal Court, in the case of

Papani v. United States, 9 Cir., 84 F.2d 160, loc. cit. 163, announced the standard of probable cause, and the court quoted approvingly from Stacey v. Emery, 97 U.S. 642, loc. cit. 645, 24 L.Ed. 1035, as follows:

" 'If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offence has been committed, it is sufficient.' "

In the very well known and landmark case entitled Carroll v. United States, 267 U.S. 132, loc. cit. 155, 45 S.Ct. 280, 286, 69 L.Ed. 543, the late Chief Justice William Howard Taft, in considering the seizure of liquor in an automobile without a warrant, said: "* * * the officer may escape costs or a suit for damages by showing that he had reasonable or probable cause for the seizure." This is applicable, in like manner to the arrest of the person.

4. The case of Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774, cited by counsel for plaintiff, does not apply. In that case the arresting officer used force and violence to obtain a confession, and the court succinctly held that the accused were entitled to an immunity from the use of force and violence to obtain such confessions. Force and violence were admittedly not employed in this case. U. S. v. Horton, D.C., 86 F.Supp. 92, loc. cit. 96; Russo v. Miller, 221 Mo.App. 292, 3 S.W.2d 266, loc. cit. 269.

■ 5. It is needless to consider Counts II and III. There was not one line of testimony that the defendants acted in bad faith or by a conspiratorial arrangement to deprive the plaintiff of any rights vouchsafed to him by the Constitution and laws of the United States or of the State of Missouri, or that they used their "powers to vent their spleen." The facts warranted them in having a well founded suspicion that the plaintiff had committed the crime. It was their duty, therefore, to press an inquiry to determine the truth.

6. A charge that they sought to influence the grand jury called to inquire into violations of the law, including this horrible murder, was totally disproved by members of the grand jury. The defendant sheriff

and his deputy were cautious and faithful, endeavoring to ferret out the crime and point the finger of accusation against the offender. There was not one line of testimony that either the sheriff or his deputy had any feeling of malice or ill will toward the plaintiff. On the contrary, the relationship of the sheriff to the plaintiff was such that only a cordial good will could have prevailed. No attempt was made to show that these defendant officers were maliciously or intentionally wrongful. They were endeavoring to do their duty. This unusual and awful crime had been immediately preceded by other similar crimes in the City of Columbia. The entire population was stirred, and justifiably so, and the sheriff and his deputy, the defendants here, were importuned for that protection and redress of wrongs it was their duty to afford. They moved diligently and earnestly apparently without fear or favor. It was unfortunate that the plaintiff, who is entitled to have the presumption of innocence indulged, was caught in a tangle or web of facts and circumstances that caused him to be singled out as the probable author of the crime. His own actions and utterances formed the basis of the suspicion, and if he has suffered in his good name and fame it was because of a creditable endeavor on the part of the defendants to serve the public they had taken oaths to protect.

The famed, able, and always logical Learned Hand expressed the correct view in the case of Gregoire v. Biddle, 2 Cir., 177 F.2d 579, loc. cit. 581, as follows:

"Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative."

It follows that the plaintiff is not entitled to recover and judgment should be rendered for the defendant. Counsel for the litigants will prepare and submit proposed findings of fact and conclusions of law, and defendants' counsel will at the same time prepare and submit an appropriate journal entry.