**MUELLER v. POWELL et al.**

No. 14720.

United States Court of Appeals
Eighth Circuit.

April 24, 1953.

Rehearing Denied June 2, 1953.

Victor B. Harris, St. Louis, Mo. (James T. Blair, Jr., Jefferson City, Mo., and Smith, Harris & Hanke, St. Louis, Mo., on the brief), for appellant.

Warren D. Welliver, Columbia, Mo. (Don C. Carter, Sturgeon, Mo., R. E. Ausmus, Centralia, Mo., and Alexander, Ausmus, Harris & Welliver, Columbia, Mo., on the brief), for appellees Powell and Wedemier.

W. E. Kemp, Kansas City, Mo. (Elliot Norquist, James P. Tierney and Kemp,

Koontz, Clagett & Norquist, Kansas City, Mo., on the brief), for appellee Ginn.

Before SANBORN, RIDDICK, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Robert P. Mueller sued the sheriff of Boone County, Missouri, and two of his deputies for redress for the deprivation of his rights under the Constitution of the United States. The action was brought in the United States District Court under the Civil Rights Act.[1] The cause was tried by the court sitting as a jury. The judgment was for the defendants, from which judgment this appeal is prosecuted.

The complaint was in three counts. The first count sought recovery against the officials for arresting appellant illegally without a warrant therefor, holding him incommunicado and subjecting him to questioning all night with no opportunity to sleep or rest when complainant says they knew he was innocent. The second count charges an unlawful conspiracy between the officers to commit the acts made the basis for the charge stated in the first count. The third count charges an unlawful conspiracy on the part of the officers to influence a grand jury to indict appellant.

The trial court sustained a motion for summary judgment in favor of one of the deputies, M. Stanley Ginn, on the ground that he was an honorary deputy sheriff, a deputy in name only, and his participation in the incidents involved was not under color of state law. After trial the trial court made and entered findings of fact to the effect that the officers had probable cause for arresting appellant and did not try to influence the grand jury. It was upon these findings, seventy-four in number, that the conclusion and judgment were based that appellant was not entitled to recover. D.C., 105 F.Supp. 344.

Appellant presents four assignments of error. First, that the trial court erred in not finding that the sheriff and his two deputies were liable to appellant under the Civil Rights Acts for depriving him of rights guaranteed to him under the Constitution of the United States. Second, that the trial court erred in finding that appellees were justified in arresting appellant without a warrant, in holding him incommunicado all night in a farm house, and in interrogating him during that time without permitting him to sleep or rest. Third, that the court erred in finding that M. Stanley Ginn was not acting under color of state law. And fourth, that the court erred in not finding that appellees attempted to in-

1. 8 U.S.C.A. § 43: "Civil action for deprivation of rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

8 U.S.C.A. § 47(3): "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

fluence the grand jury unlawfully to indict appellant and deprive him of the equal protection of the law guaranteed under the Constitution.

The first assignment is predicated upon the assumption that appellant was deprived of his liberty without due process of law by state officers acting as such, and that under those circumstances he has a cause of action under the Civil Rights Acts. If the assumption be correct the conclusion is also correct. Which immediately brings us to the question whether he was deprived of his liberty without the due process of law assured under the Constitution of the United States.

■ The "due process" guaranteed by the federal Constitution to all citizens is a practical, living thing that is not to be measured entirely by the state's concept of due process evidenced by state procedural laws designed and intended to afford the protection of state constitutional guarantees of the same right. If the procedure prescribed by the state actually affords the character of due process contemplated by the federal Constitution, and is followed, there is no denial of the right under the federal Constitution. While if it does not, or is not followed, the right has been violated. Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559.

■■ We do not understand that it is or could be seriously contended that the Missouri constitutional and statutory safeguards against unlawful arrests are inadequate or do not, when followed, constitute the character of due process guaranteed by the federal Constitution. The charge is, as embraced in the second assignment of error, that the proof showed such a lack of compliance with the state procedure that the result was an unlawful arrest under Missouri law and a fortiorari under the federal Constitution, and that the trial court erred in finding that appellant's arrest was lawful under the latter. For, as stated in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, the problem is not whether state law has been violated but whether the inhabitant of a state

has been deprived of a federal right by one who acts under color of any state law. But since, as noted heretofore, the Missouri procedure, if followed, is synonymous with due process under federal law, we may use as the test of lawfulness of appellant's arrest the requirements for a lawful arrest under the state law.

The Missouri statutory procedure for a lawful arrest and detention is amply indicated by such cases as McKeon v. National Casualty Co., 216 Mo.App. 507, 270 S.W. 707; State v. Williams, 328 Mo. 627, 14 S.W.2d 434; State of Missouri ex rel. and to Use of Ward v. Fidelity & Deposit Co., 8 Cir., 179 F.2d 327; State v. Nolan, 354 Mo. 980, 192 S.W.2d 1016; State v. Bailey, 320 Mo. 271, 8 S.W.2d 57.

■ From those decisions it is readily apparent that under the law of Missouri an officer charged with the duty of enforcing the law, such as the appellees herein, is justified in making an arrest without a warrant, although no felony has actually been committed, but is suspected, and there is reasonable or probable grounds to suspect that the person arrested committed the crime. Our question becomes one of probable cause.

■ What constitutes probable cause or reasonable ground for suspicion that a person arrested without a warrant committed the offense for which he was arrested must be defined in general terms and the general definition applied to each case as the facts peculiar to each case warrant. This court, in State of Missouri ex rel. and to Use of Ward v. Fidelity & Deposit Co., 8 Cir., 179 F.2d 327, 333, quoted the following from Russo v. Miller, 221 Mo.App. 292, 3 S.W.2d 266, 269, as the law of Missouri:

" * * * What would constitute such a reasonable and probable ground of suspicion is incapable of exact definition, beyond saying that the officer must not act arbitrarily, but must exercise his discretion in a legal manner, using all reasonable means to prevent mistakes. In other words, he must be actuated by such motives as would influence a reasonable man acting in good faith; and he must proceed upon the basis of a belief in the person's guilt, derived either from

the facts or circumstances within the officer's own knowledge, or upon information imparted to him by credible and reliable third parties, provided, however, that there are no circumstances known to the officer of sufficient import as materially to impeach the information so received."

██ In determining the sufficiency of the evidence to support the trial court's finding that appellant's arrest was based upon probable cause to suspect that appellant had committed the offense for which he was arrested and that his arrest was not based on mere suspicion, held insufficient in Mc-Keon v. National Casualty Co., supra, the evidence must be viewed in the light most favorable to the factual conclusion reached by the trier of the facts. Stated in that manner, those facts were as follows.

On the evening of March 18, 1950, Janet Christman, a young lady fifteen years old, was raped and brutally murdered while acting as a baby-sitter at the home of Mr. and Mrs. Edward Romack, near the city limits of Columbia, Boone County, Missouri. The crime was discovered when the Romacks returned to their home after midnight and found the lifeless body of Miss Christman, partially nude, upon the floor of the living room. She had been killed by strangulation with an electric iron cord tied tightly around her neck. The cord had been cut from an electric iron kept in a bedroom adjoining the living room. Appellant was about 27 years of age, a captain in the United States Air Force with a distinguished military record in World War II. He had been a close friend of Romack since boyhood. After their marriages and appellant's return to Columbia, they continued their friendship and the families frequently entertained each other in their homes. Appellant was familiar with the Romack home. He had on occasion used the electric iron and knew where it was kept. He knew Janet Christman, and he and his wife had employed her as a baby-sitter in their home on several occasions. He had expressed admiration for Janet's figure and her mature development, and expressed the opinion she was a virgin. There was testimony he had talked much about "trying to get a virgin". He had made advances to Mrs. Romack and she had told the officers she thought appellant was oversexed. He had suggested to Romack that they go to a parking and picnic area for students, known as Hinkson Creek, and "get a nice young girl".

The time of the murder was fixed at between 10 p. m. and midnight. On the head of the victim were several small round wounds which could have been caused by a mechanical pencil such as one appellant was known to carry. There was evidence of a considerable struggle in the kitchen, living room and bedroom. Miss Christman had been instructed by her parents to keep the door of the Romack home locked when she was baby-sitting there and not to open it for anyone she did not know. It was her custom to turn on a strong porch light when she heard the Romacks returning. She knew appellant. The front and back doors were both unlocked upon the Romacks' return, and the porch light was on. The Romacks' small son was accustomed to having the radio on while he was sleeping when his parents were away. Appellant knew that. When the Romacks returned the radio was still on, although the station to which it was tuned had ceased broadcasting. The perpetrator of the crime had apparently undertaken to make it appear that entrance to the home had been made through a window in the living room by breaking the window. A garden hoe was found near the window on the outside of the house, with which the window had been broken, but undisturbed furniture and fixtures near the window in the house made it impossible that the intruder could have entered through the window. On the morning after the murder, before the information had been made public that the interior of the home had been greatly disturbed by a struggle, appellant called Romack and offered to come over and "clean up the mess". On the morning after the crime, appellant told Romack that he did not have an alibi but "I don't have no scratches." He knew that Miss Christman was to be at the Romack home the evening of her murder.

We relate the foregoing facts and circumstances as if they were correct. We do not assume they are. Many were denied by appellant. But there was evidence tending

to prove those facts, and therefore we must assume the trial court could have concluded many or all were correct in our determination of whether there was evidentiary justification for the findings that court made.

Soon after the beginning of the investigation of the crime, Deputy Wedemier formed the opinion, not without logic, that the crime was an "inside job", perpetrated by someone well known to the victim and well acquainted with the Romack home. Everyone known to fill that description was investigated. By the process of elimination, appellant became the "Number One Suspect". It was the opinion of Mrs. Romack that none of their male friends familiar with their home, who knew Miss Christman and was known to her, except appellant, could have committed the crime.

The sheriff and appellant were friendly. It does not appear that the arrest of appellant was for the purpose of securing the pencil, but apparently the sheriff and his deputies deemed it of some importance to arrest appellant when he had the pencil on his person, without his knowing in advance of their interest in it or its possible significance as evidence. The sheriff had tried on several occasions to find an opportunity to "pick up" appellant when he had the pencil, without success. A fictitious card party was arranged by Romack for the evening of May 4th, and appellant was invited. He usually kept score, and it was determined to make the arrest at that time when he would probably have the pencil. Romack called for appellant about 8:00 p. m., and they both got into appellant's car. By prearrangement the sheriff and the two deputies were waiting near by. Appellant was then arrested and ordered to drive to Deputy Wedemier's home on a farm several miles from Columbia. When they arrived there appellant was questioned all night. The following day he was taken, with his consent, to Jefferson City and subjected to a lie detector test. That afternoon he was returned to Columbia and released. The sheriff's expressed intention for taking him to Wedemier's home for questioning after his arrest, instead of to the county jail, was to avoid publicity. But his unexplained absence from his home caused much anxiety to his family, notification to the city police and the State Highway Patrol, and wide publicity. The crime was investigated by a county grand jury but no indictment returned. The record indicates that this action was brought more for vindication of appellant's good reputation than for financial redress.

Appellant's guilt or innocence of the crime for which he was arrested and about which he was questioned was and is not the issue in this case. The trial court expressed no opinion on that question. We, of course, express none. The issue was whether there was factual justification or "probable cause" for the appellees to suspect that appellant had committed the crime. The trial court found there was. Much of the evidence upon which the officers acted was communicated to them by others in the course of the investigation and did not consist of facts to which the officers could testify as within their own personal knowledge. Appellant says that only such facts as they knew themselves and could testify to as such could be used by them as justification for suspecting appellant. Worthington v. United States, 6 Cir., 166 F.2d 557, 565, is cited in support of that argument. The opinion in that case may be susceptible to that interpretation. It was a search warrant case, and although the arrest preceding the search was made as a pretext to search for evidence, was therefore illegal and furnished no legal justification for the subsequent search, the court in holding that the search was illegal stated that: "The facts necessary to uphold an arrest without a warrant must be sufficiently strong to support the issuance of a warrant for arrest." With that we agree. And the support is probable cause. But the court then says: "In no case may *an arrest* or a warrant for arrest be based upon opinion or suspicion of some person *unsupported by personal knowledge of facts*". If by the latter language is meant that an officer of the law may not act on reliable information furnished by others, but not within the personal knowledge of the officer himself, we do not agree. As pointed out in State v. Williams, 328 Mo. 627, 14 S.W.2d 434, and

State v. Raines, 339 Mo. 884, 98 S.W.2d 580, the constitutional requirement found in the Fourth Amendment and the Missouri Constitution V.A.M.S.Const. art. 1, § 15, that no search warrant shall issue but on probable cause, *supported by oath or affirmation,* does not apply to ordinary arrests without a warrant. For the latter only probable cause need exist. In McKeon v. National Casualty Co., 270 S.W. 707, 712, cited and relied upon by appellant, the court says: "Circumscribed by a limited authority to arrest, the arresting officer must have *either* actual or historical credible knowledge that the party whose arrest is sought has committed a crime and, respecting that crime, is at large without bail." In Russo v. Miller, 221 Mo.App. 292, 3 S.W.2d 266, 269, we direct attention to a portion of what we heretofore quoted from that opinion: " * * * and he [the officer] must proceed upon the basis of a belief in the person's guilt, derived either from the facts or circumstances within the officer's own knowledge, or upon information imparted to him by credible and reliable third parties, * * *." Clearly, it has long been the law in Missouri that facts and circumstances learned by an officer in the course of his official investigation of a criminal offense may constitute the basis for the necessary probable cause which will justify an arrest without a warrant. And although the test to be applied in determining constitutional rights under the federal Constitution is not to be determined by the criterion fixed by the state courts in enforcing similar provisions of a state Constitution or local statutory requirements, we are referred to no decision of the Supreme Court which directs or requires that the Missouri concept of probable cause be overthrown. It has furnished ample and adequate protection to citizens within the state long before the threat of the "knock on the door" so dramatically emphasized in Worthington v. United States, supra. There has been no "police state" recognized or permitted in Missouri in the past under existing law and there will be none in the future. It is unnecessary to strike down long tried and established law enforcement practices because of a fear, as expressed by counsel, that a "police state" will develop unless the law be changed.

We cannot in view of the facts appearing in this record, many of which were physical in nature and of which the officers had personal knowledge gained by their investigation, hold that the trial court's finding was clearly erroneous. We therefore have no right to disturb the finding.

The argument is made that even if, as the trial court held,[2] by Sec. 544.210 RSMo 1949, V.A.M.S., appellant was lawfully arrested without a warrant and was lawfully held not exceeding twenty hours, appellant was entitled to give bail and a denial of an opportunity to do so was unlawful. Such denial is unlawful.[3] But as stated in Harbison v. Chicago, R. I. & P. Ry. Co., 327 Mo. 440, 37 S.W.2d 609, 614, 79 A.L.R. 1, whether a person has been illegally deprived of the right to make bail depends on the facts:

2. Mueller v. Powell, D.C., 105 F.Supp. 344.

3. Chap. 544, Sec. 544.170 R.S.Mo.1949, V.A.M.S.: "All persons arrested and confined in any jail, calaboose or other place of confinement by any peace officer, without warrant or other process, for any alleged breach of the peace or other criminal offense, or on suspicion thereof, shall be discharged from said custody within twenty hours from the time of such arrest, unless they shall be charged with a criminal offense by the oath of some credible person, and be held by warrant to answer to such offense; and every such person shall, while so confined, be permitted at all reasonable hours during the day to consult with counsel or other persons in his behalf; and any person or officer who shall violate the provisions of this section, by refusing to release any person who shall be entitled to such release, or by refusing to permit him to see and consult with counsel or other persons, or who shall transfer any such prisoner to the custody or control of another, or to another place, or prefer against such person a false charge, with intent to avoid the provisions of this section, shall be deemed guilty of a misdemeanor."

"It might be well to say in passing, that we do not hold that every time an officer makes an arrest it is his duty to immediately take the prisoner before the proper officer for the purpose of giving bond, regardless of the circumstances surrounding the arrest. The time of day or night the arrest is made, the condition of the prisoner, his ability and readiness to give a sufficient bond, and other circumstances not necessary to mention here, are all determinative factors. Each individual case must stand on its own facts."

The record shows that no request was made to make bail. Mr. Mueller testified:

"On the occasion when I was apprehended, Mr. Wedemeier came up alongside my car and directed me where to go and I was taken out to his home and interrogated there. In the course of that interrogation there was no violence of any kind used upon me. I didn't ask to use the telephone and made no request to communicate with anyone. The only request I made was to communicate with my wife and tell her where I was because she was on call to the hospital and would need the car if she were called. I didn't know there was a telephone out there. I was never shown a telephone. I didn't inquire. It was out in the country."

\* \* \* \* \* \*

"I would say after I had been there for hours, say after midnight, I begun to get a little provoked that they weren't at least trying to take my word for something, and I first started to object to the conduct of the officers. I did not express any such sentiment as that to any of the officers. I wasn't trying to make them mad. I was trying to cooperate and get away from them. I did not protest that I had been there long enough or anything of that kind. I didn't protest anything. Nothing was said by me there to indicate to the officers I felt I was being held and questioned for an undue length of time. I didn't even know what to do in that situation."

Under these circumstances there was no unlawful denial of the right to make bail. Nor was there mistreatment shown.

The assignment that the trial court erred in entering a summary judgment in favor of Appellee Ginn on the ground that he was not acting under color of state law appears to us to have considerable merit. See State ex rel. Bradford v. Dinwiddie, Mo.Supp., 237 S.W.2d 179; Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495. But we do not pass upon the question, since it is evident that no different result would have been reached as to any of appellees had Ginn remained in the case as a defendant throughout the trial.

The situation presented by the record as to the fourth assignment of error, that there was error in not finding that appellees attempted to influence the grand jury to indict appellant, is the same as that presented as to the second. We find no justification for disturbing the trial court's finding that appellees did not attempt to influence the grand jury.

The judgment must be and is affirmed.