Mrs. Mary Ellen PRITCHARD et al.,
Plaintiffs,

v.

Robert C. DOWNIE, Administrator of the
Estate of Eugene G. Smith, Deceased,
Defendant.

Civ. A. Nos. 3768, 3769, 3786–3789,
3805–3807.

United States District Court
E. D. Arkansas, W. D.

March 22, 1963.

Sidney W. Provensal, Jr., New Orleans, La., Amis Guthridge, Little Rock, Ark., for plaintiffs.

Joseph C. Kemp, Robert S. Lindsey, John M. Harrison, and Winslow Drummond, Little Rock, Ark., for defendant.

YOUNG, District Judge.

Nine lawsuits were originally brought by ten plaintiffs against Little Rock Police Chief Eugene G. Smith under 42 U.S.C. § 1983. They grew out of occurrences in August 1959 when Little Rock Central High School was racially integrated. All of these plaintiffs but one, as well as a number of other persons, were arrested by Little Rock police near the high school.

Each plaintiff has alleged that he or she was deprived of a right guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution. While the facts vary as to each plaintiff, they contend generally that they were: (1) arrested without cause, (2) excessive force was used in connection with the arrest of several of them, (3) they were falsely imprisoned, (4) they were denied opportunity to promptly post bail or to consult their attorneys, and (5) that certain of the plaintiffs who were minors were carried to the city jail instead of the county juvenile court.

Before these cases could be brought to trial, the defendant Smith died, and Robert C. Downie, Administrator of the Smith estate, was substituted as party defendant. After the death of Chief Smith, motions to dismiss these actions were filed by the defendant on the theory that they abated upon the death of defendant Smith. These motions were granted by the court, and the complaints dismissed. Lauderdale v. Smith, 186 F. Supp. 958 (E.D.Ark.1960), but the Court of Appeals for the Eighth Circuit reversed and reinstated the complaints. Pritchard v. Smith, 289 F.2d 153 (8th Cir., 1961). (The Lauderdale case itself was actually not appealed, and the court's 1960 order of dismissal is therefore dispositive of it.)

On November 9, 1961 the defendant filed a motion to dismiss, alleging that the claims of the defendants were barred by the Arkansas Statute of nonclaim. Act No. 140 of Acts of Arkansas for 1949, §§ 111 and 110, Ark.Stats., (Pocket Supp., 62–2602 and 62–2601). On February 9, 1962 this motion was denied (see Pritchard v. Downie, 201 F.Supp. 893 (E.D.Ark.1962)), but the defend-

ant's application for leave to take an interlocutory appeal was granted, and the decisions were appealed. On November 13, 1962 the Court of Appeals affirmed this court's ruling. Downie v. Pritchard, 309 F.2d 634 (8th Cir. 1962).

On January 15, 1963 the remaining cases were consolidated and tried to the court on January 21–23, 1963. The court's findings of facts and conclusions of law are set out in the following discussion.

At 1:00 p. m. August 12, 1959, Little Rock Central High School was racially integrated. About 10:00 that morning a mass meeting was held on the steps of the Arkansas Capitol Building to protest the integration of the high school. The Governor of the State and others spoke to the crowd. After the speeches more than 200 people began to march toward Central High School. The marchers proceeded to the intersection of Fourteenth and Schiller Streets, a block east of the school, where they were met in the street by Police Chief Eugene G. Smith and a complement of Little Rock police officers. Chief Smith was unarmed. He was in charge of the police and carried a megaphone with which he addressed the crowd. Most of the other policemen carried night sticks or side arms.

In the forefront of the marchers were four or five men carrying American flags. Others carried signs indicating their opposition to integration.

The marchers stopped within three or four feet of the police line. By that time they were transformed into a shouting and unruly mob. Members of the mob cursed the police. Four men and youths in the front of the march tried to push through the police line. The police seized them and led them to patrol cars.[1] Chief Smith told the people to leave the street and to disperse and go home. A few obeyed, but the majority continued in their protest. The police attempted to move segments of the crowd out of the street. Several resisted and were arrested.

By 11:30 the crowd had increased to over 300. At about 11:45 a fire truck arrived, and high pressure fire hoses were attached to a hydrant and the water from the hoses was directed toward those who had refused to vacate the streets. The water from the fire hoses calmed the crowd temporarily, but at about 12:20 p.m. the crowd started coming into the streets again. During all of this time Police Chief Smith had urged the crowd to disperse and go home. By 1:00 p.m. the crowd had quieted and most of the mob had departed.

The police arrested a number of individuals, including all of the plaintiffs in this action except Mrs. Lela Sosebee.

Following is a short summary of the facts as to each individual plaintiff.

### LEON KYZER

Leon Kyzer, who was 16 years old at the time of his arrest, marched in the forefront of the mob from the Capitol to the intersection of Fourteenth and Schiller and was one of the first of the demonstrators to be arrested. When commanded to leave the street and the vicinity he failed to do so and attempted to push past the officers, and after a struggle in resisting the officers he was quickly arrested and placed in the patrol wagon standing nearby. Kyzer was taken to the city jail and was held until around 5:00 in the afternoon; he made no request to use the telephone and was in no way harmed at the police station. Several newspapers ran a picture of him being taken to the patrol wagon, which he contends caused him much embarrassment.

Kyzer testified that Eugene Smith raised a club as if to hit him just before

---

1. A representative from the Police Department and newsmen took moving pictures of the scene, and pertinent portions of these moving pictures were introduced at the trial by the defendant. These pictures graphically depicted the march from the Capitol to Fourteenth and Schiller Streets, as well as the activities at that intersection, and proved beyond question that the marchers and bystanders became an unruly, riotous and threatening mob.

the arrest, but Smith did not have a club that day.

Leon Kyzer was charged with disturbing the public peace, under § 41–1401 of the Arkansas Statutes.

### MARY ELLEN PRITCHARD

Mrs. Pritchard had made the march from the Capitol and had failed to disperse when so commanded. Shortly before her arrest she was standing on the northeast corner of the intersection. She was asked to move from the corner, but refused; Officer Bentley then attempted to escort her away from the corner, but Mrs. Pritchard resisted. While the officers were arresting her she cursed them and physically attacked Officer Bentley. Officers King, Bentley, Weeks, and Alloway all assisted in Mrs. Pritchard's arrest.

Mrs. Pritchard could not say nor was there any evidence to the effect that Chief Smith had anything at all to do with her arrest or treatment after arrest.

Mrs. Pritchard was taken to the city jail, photographed, fingerprinted, and held until around three o'clock that afternoon; she does not contend that she was mistreated in any way while at the jail.

Mrs. Pritchard was charged with loitering, under § 583 of Brickhouse & Castle's Digest of Little Rock Ordinances; obstructing and resisting an officer, under § 41–2801 of the Arkansas Statutes; and assaulting an officer, under § 41–2802 of the Arkansas Statutes.

### CALVIN PARRISH

Calvin Parrish, who was 18 in 1959 and weighed about 210 pounds, and his father were not members of the marchers; they joined the crowd at Fourteenth and Schiller. Calvin had been in and out of the street and had refused to disperse upon command. Chief Smith shouted to his officers to "get that big boy", and an attempt was made to apprehend him by Officer Bair. Bair contends that Calvin was using abusive language and that when he attempted to make the arrest Calvin jerked away and ran; Calvin himself admits running from the officers. A running battle ensued, and at last Calvin was struck on the head by Officer Chambers and suffered two rather nasty cuts. According to Sgt. Moore, Parrish would come out of the crowd, "holler", and go back into the crowd. He was "loud, yelling, and called the police 'nigger lovers'." Sgt. Bentley testified that he was struck by Parrish after he followed him into the crowd. Officer Bair said that Parrish had been using abusive language, and when he tried to arrest him he went into the crowd. After Bair caught him Parrish hit him with his fist and ran. The other officers caught him and four of them took him to the "paddy wagon". Officer Weeks saw him fighting an officer and grabbed him but he got loose. Parrish himself contended that the only thing Chief Smith had to do with his arrest was to point to him and say "Pick him up." Parrish also testified that if he hit a policeman he didn't remember it.

He was then taken to the city jail where he stayed for 15 or 20 minutes before being taken to the University Hospital for emergency treatment; after the cuts on Calvin's head were treated he was returned to jail where he was fingerprinted, photographed, and released around 3 o'clock in the afternoon.

H. E. Parrish, Calvin's father, said that he shouted for the policemen not to hit Calvin because he was a sick boy.[2] According to the officers, none of them heard him. H. E. Parrish knew where Calvin was at all times, and was allowed to be with him at the emergency ward at the hospital. Calvin Parrish was charged with resisting an officer, under § 41–2801 of the Arkansas Statutes; and assaulting an officer, under § 41–2802 of the Arkansas Statutes.

### MARILYN and GLENNA PAUL

Marilyn, 14, and Glenna, 16, went to the rally at the Capitol; they did not participate in the march, but joined the demonstrators at Fourteenth and Schiller. It is apparent from the evidence

2. Calvin Parrish's father testified that Calvin suffered from epilepsy.

that both girls stayed in the front of the crowd and were in the street after Smith had instructed them to leave the street, disperse, and return to their homes. Both yelled and jeered at the police. At the time of their arrest the Paul sisters were standing in a group of five people on the southeast corner of the intersection; this group would not leave the corner, and Chief Smith ordered their arrests. Both girls were apprehended without violence of any kind and placed in a police sedan with two other young people. They were taken to the city jail where they were photographed, fingerprinted, and released at about 3 o'clock that afternoon. Marilyn requested that she be allowed to use the telephone but was refused. Both girls were placed in a cell with an adult. Marilyn and Glenna's names appeared in the newspapers and they testified they were subjected to much embarrassment as a result of the arrest.

The Paul girls were among the first of these plaintiffs to be arrested after the fire hoses had been turned on. Both girls had been sprayed with water at the time of their arrest, and this would fix the time of said arrest after 11:40 a.m. See also Defendant's Exhibit No. 1.

The Paul girls were charged with loitering, under § 583 of Brickhouse & Castle's Digest of Little Rock Ordinances.

### LARRY BUSTER

Larry Buster, who was 12 in 1959, accompanied his mother in the march from the capitol. He was in the front line of the marchers. Larry refused to leave the intersection when ordered to do so, and he continued to mill around in the crowd. He had been running in and out of the crowd although repeatedly told not to do so. At the time of his arrest he was standing on the southeast corner of the intersection with the Paul girls, and was likewise arrested for refusing to leave the corner. Larry had

been soaked by the water from the fire hose.

He was taken to jail in the same manner and same car as the Paul sisters; at the jail he was photographed, fingerprinted, and released about 2 o'clock that afternoon. It is admitted that Buster was only kept in a cell for about an hour and then brought upstairs where he stayed with his mother for another hour. However, during the time he was in a cell, an adult shared it with him. According to Larry and his mother the arrest was quite a difficult experience for Larry; he was greatly embarrassed and depressed.

Larry Buster was charged with loitering, under § 583 of Brickhouse and Castle's Digest of Little Rock Ordinances.

### J. D. BASS

Mr. Bass, a citizen of Pine Bluff, 45 miles distant from Little Rock, made the march from the Capitol with the crowd; he first was noticed by the officers after the fire department began to spray water on those people who would not leave the street. Mr. Bass marched back and forth across the street carrying the American flag, and it appears from the testimony that Bass had allowed the flag to become wet. Officer Bentley demanded the flag, and Bass complied with this command. It is uncertain what happened next, but at any rate Bass did not leave the street or the vicinity of the intersection, and he was arrested, taken to jail, refused bail until he was photographed and fingerprinted, and released about 4 or 5 o'clock in the afternoon.

Bass testified that he was hurt "pretty bad". He alleges that the officers (Alloway, King and Winkler) twisted his arm and handled him roughly.

Bass further testified that he can't say that Chief Smith had anything whatever to do with his arrest, and there is no testimony to indicate that Smith ordered or requested any officer to arrest Bass.[3]

---

3. All the officers who testified in regard to Bass stated that he walked up to Smith and grabbed his lapel. None of these officers indicate that Smith then ordered

Bass was charged with loitering, under § 583 of Brickhouse and Castle's Digest of Little Rock Ordinances; and assaulting an officer, under § 41–2802 of the Arkansas Statutes.

## LELA SOSEBEE

Mrs. Sosebee, who was 69 in 1959, was among the marchers, and is the only one of the plaintiffs who was not arrested. It appears that Mrs. Sosebee was either pushed back by the police or knocked down inadvertently by an officer while he was trying to fend off an attacking member of the crowd.[4] Mrs. Sosebee was not arrested, in fact, it appeared from the motion picture placed in evidence by the defendant that she received the solicitude of Chief Smith after her fall.

The facts indicate that Mrs. Sosebee's injuries, if any, were negligible. In fact, she stated that after her fall she went back to the curb and stayed until the crowd dispersed.

Chief Smith was in no way connected with Mrs. Sosebee's fall.

## CHARLES JAMES BAILEY

Bailey, who was a 195–200 pound 15 year old in 1959, was with the marchers and demonstrators who congregated at the intersection of Fourteenth and Schiller. Bailey testified that he intended to enter school that day, but he made no attempt to display his pass[5] and proceed through the line. Bailey was on the scene about an hour and a half, and was one of the last to be arrested. He did yell a chant,[6] but was not profane. The evidence is that Charles refused to leave the southeast corner of the intersection, and was arrested for his noncompliance. There can be no doubt that Bailey had heard Eugene Smith command the crowd to disperse, and more specifically to get back from the corners.[7]

Charles was taken to the city jail and held in a cell with adult prisoners, photographed, fingerprinted, and released around the middle of the afternoon.

Charles' name appeared in the newspapers and he said the incident caused him a great deal of embarrassment. He moved to Magnet Cove, Arkansas, to attend high school because he was too embarrassed to return to Central, and he has never returned to Central High School.[8]

There is no evidence that Chief Smith had anything to do with the arrest of Charles Bailey. Smith instructed Officer Halcomb to remove the people from the corner, but there is no testimony that Smith even knew that Bailey was arrested.

Charles James Bailey was charged with loitering, under § 583 of Brickhouse and Castle's Digest of Little Rock Ordinances.

Before we turn to the legal issues involved in this case, I think it would be well if the situation at the Little Rock City Jail was quickly described. The

his arrest, but contend that they arrested Bass on their own volition after this incident.

4. Mrs. Sosebee testified that she was hit from the back while attempting to get out of the street; she does not know who pushed her, but she does remember the policemen pushing back the crowd in which she was standing. Charles Bailey testified that he saw an officer push her down. Officer Kitchens contends that he pushed her away from him as she attacked him in order that he might face a male assailant.

5. Students who were entitled to enter Central High School were given passes so that they might go through the police line.

6. This chant, yelled periodically by the crowd, was: "Two, four six, eight; we don't want to integrate."

7. Bailey was soaking wet at the time of his arrest, and this would at least be evidence that he was among those people who would not leave even after the hoses were turned on. This, coupled with his own admission that he had been at Fourteenth and Schiller for about an hour and a half, certainly shows conclusively that he was a member of the mob that would not obey Chief Smith's commands to disperse.

8. Bailey completed his high school training at Jacksonville, Arkansas.

condition at the jail can be described as a state of pandemonium. It must have appeared to Officer McKneely, the jailer, that a great exodus of law violators was descending upon him. An attempt was made to process the people brought in from Fourteenth and Schiller as quickly as possible, but necessarily it could not be done as quickly as could be wished. In light of all the confusion, I feel that the prisoners were dealt with quickly and efficiently.

## CONCLUSIONS OF LAW

█ It seems clear that Smith, as Chief of Police, was not liable for the independent acts of other police officers. See Casey v. Scott, 82 Ark. 362, 101 S.W. 1152 (1907); 47 Am.Jur., Sheriffs, Police and Constables, § 160 at p. 935.

It is admitted by Pritchard, Bass, Sosebee, and Bailey that Gene Smith had nothing to do with their arrests, or in the case of Mrs. Sosebee, her fall. Further, it is a certainty that Smith also had nothing to do with Kyzer's arrest. There is no doubt then that Smith's estate cannot be liable for the wrongs, if there were any such wrongs, committed by others, and it therefore follows that in the cases concerning Pritchard, Bass, Sosebee, Bailey, and Kyzer, the plaintiffs have failed to prove any case against Smith's estate.

Even in the cases of the Paul Girls, Larry Buster, and Calvin Parrish, it is not alleged that Smith himself injured them, placed them in an inappropriate jail or with inappropriate companions.

█ But we need not and we prefer not to stop here. If the laws of Arkansas do not themselves deprive one of his constitutional rights, and they do not, the question of whether the plaintiffs were lawfully arrested will be decided by a determination of the requirements for lawful arrest and imprisonment under the law of Arkansas. Mueller v. Powell, 203 F.2d 797 (8th Cir. 1953).

Arkansas Statute § 42–201 requires that the commission of public offenses must be prevented by suppressing riots. Further, in the same chapter the statutes require that when twenty or more people are unlawfully or riotously assembled, the peace officers must order them to disperse, Ark.Stat.Ann. § 42–207, and if the crowd does not disperse it is then the duty of the peace officers to arrest the people who make up the riotous assembly. Ark.Stat.Ann. § 42–207. As a matter of fact, it is a misdemeanor for an officer of the law to neglect to suppress an unlawful or riotous assembly. Ark.Stat. Ann. § 42–209.

Section 42–211 of the Arkansas Statutes requires that an "Unlawful assembly of three or more persons" be treated in the same manner as a riotous assembly. An "unlawful assembly" is defined in § 41–1402 as an assembly of three or more persons who " * * * assemble together, with the intent, or being assembled, shall agree mutually, to assist each other to do an unlawful act, with force or violence, against the person or property of another, or against the peace, or to the terror of the people, and shall accomplish the purpose intended, or do any unlawful act in furtherance of such purpose, in a violent or turbulent manner * * *."

█ There can be no doubt that Chief Smith, as a peace officer, had the right to arrest the plaintiffs under the statutes just presented if the said plaintiffs were in fact members of an unlawful or riotous assembly. In addition plaintiffs were charged (with one exception) with the following offenses: (1) Obstructing or resisting an officer in violation of § 41–2801 of the Arkansas Statutes (Mary Pritchard and Calvin Parrish); (2) Assaulting an officer in violation of § 41–2802 (Mary Pritchard, Calvin Parrish, and J. D. Bass); (3) Disturbing the peace in violation of § 41–1401 (Leon Kyzer); (4) Loitering and refusing to disperse when requested to do so by a police officer in violation of § 583 of Brickhouse & Castle's Digest of Little Rock Ordinances[9] (Mary Prit-

9. Section 583—LOITERING AROUND PUBLIC PLACES, ETC.—REFUSAL TO DISPERSE—PENALTY—Any person who in this city shall be found loiter-

chard, Charles Bailey, Larry Buster, Glenna and Marilyn Paul, and J. D. Bass). The validity of the statutes and ordinances has not been questioned, and it cannot be doubted that Smith had the authority to arrest the plaintiffs if they were violating any of the above mentioned statutes or the Little Rock Ordinance. Further, I can make no other finding but that each and every one of the plaintiffs, with the possible exception of Mrs. Sosebee, were in violation of at least one of the statutes or the ordinance with which they were charged. In addition, I find that every one of the said plaintiffs were members of an unlawful and riotous assembly, and upon their failure to disperse upon command the police officers were under a duty to arrest them under § 42–208 of the Arkansas Statutes. Thus, none of the plaintiffs were falsely arrested or imprisoned.

■ ■ Neither have any of the plaintiffs made any case upon the premise that Smith used such force that the plaintiffs were deprived of a right " 'fundamental' or 'implicit in the concept of ordered liberty'." See State of Arkansas for Use and Benefit of Temple v. Central Surety & Insurance Corp., 102 F.Supp. 444 (W.D.Ark.1952). Sections 43–403, 412, 413 of the Arkansas Statutes set out the manner in which an Arkansas peace officer may make an arrest. Section 43–403 gives a policeman the right to arrest a person for a public offense when such offense is committed in his presence. Section 43–413 provides that no unnecessary force or violence should be used in making the arrest. It is my opinion that there was no excessive force used in the arrest of any of the plaintiffs. It is not even contended that Smith himself made an actual arrest, much less used excessive force on any of the plaintiffs. In fact, the testimony upon at least two oc-

casions is that Smith specifically warned his officers to be careful when apprehending certain individuals. It was obvious from the moving pictures and the testimony that the only plaintiffs who indicated that there was undue violence in their arrests.[10] were resisting arrest, and what force was used was the minimum necessary.

Calvin Parrish, Charles Bailey, Leon Kyzer, Larry Buster, and the Paul girls[11] all contend that they were deprived of some constitutionally guaranteed right by not being taken to the juvenile court instead of the city jail. In support of this contention they cite Ark. Stat.Ann. § 45–224, which provides:

"When in any county where a court is held as provided for in section 2 of this act, a child under the age of twenty-one years is arrested without a warrant, it shall be the duty of the officer making the arrest to take said child directly before the juvenile court of the county and it shall be the duty of the court, after having given the notice required by this act to proceed to examine said case and determine whether said child is a dependent or a delinquent child as defined by this act and deal with the same as herein provided, or it shall be within the discretion of the judge of the juvenile court to dismiss the cause therein pending and transfer such child to any of the courts of this State having jurisdiction of the offense of which said child may be found to be guilty; * * *."

■ The plaintiffs contend that this statute requires that minors be taken to the juvenile court instantly and always. I have considerable doubt as to the efficacy of this position. Section 45–240 of the Arkansas Statutes provides that nothing in this act (which includes 45–

ing at corners or in the vicinity of any place of amusement or hotel or thoroughfare, and refuse to disperse or vacate such place when requested to do so by any police officer, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than two

dollars nor more than twenty-five dollars. Ord. 671, May 4, 1896.

10. Mary Pritchard, Calvin Parrish, Leon Kyzer, and J. D. Bass.

11. All of these plaintiffs are minors.

224) will affect or prevent "proceedings under any act or statute of this State which may have otherwise defined any specific act of any person as a crime or misdemeanor of any character, which act might also constitute contributory delinquency or contributory dependency, or to prevent or to interfere with proceedings under any such acts, * * *." It appears from this statute that the officers may elect as to the manner in which they are to proceed; i. e. whether the child should be taken before the juvenile court as a delinquent or charged in criminal court under a separate crime or misdemeanor. The record reflects that this has been the customary practice of the Little Rock police under these statutes.

■ The short answer to this question is that even if the Arkansas Statute was violated by not taking the minors immediately to the juvenile court, there was no violation of any federally guaranteed right. As we have held earlier there was no false arrest involved here;[12] therefore, if the plaintiffs are to prove a case they must show that they were wrongfully confined and that this confinement violated a right which is " 'fundamental' or 'implicit in the concept of ordered liberty'." See State of Arkansas v. Central Surety & Ins. Corp., supra.

■ There is no doubt that the due process clause of the Fourteenth Amendment guarantees an individual certain rights,[13] "A state defendant should have the opportunity to have all issues which may be determinative of his guilt tried by a state judge or a state jury under appropriate state procedures which conform to the requirements of the Fourteenth Amendment." Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed. 2d 760 (1961). The rights of free speech, free press, and the freedom from unconscionable invasion of one's privacy by governmental officials are guaranteed under the due process clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The extraction of a confession from an accused person by force and violence is prohibited. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951); Rogers v. Richmond, supra. Perhaps even an unlawful arrest and detention without more is a deprivation of due process and actionable under 42 U.S.C. § 1982. Cf. United States v. Trunko, 189 F.Supp. 559 (E.D.Ark. 1960); Watkins v. Oaklawn Jockey Club, 86 F.Supp. 1006 (W.D.Ark.1949).

But I have not found, nor have I been cited to any authority which would support the minor plaintiffs' contention that they were denied a right guaranteed by the Fourteenth Amendment by being taken to the city jail instead of the juvenile court. The fact that the minors were not proceeded against under the Arkansas Statutes dealing with procedure in criminal cases involving juveniles can by no stretch of the imagination be considered a deprivation of a right which is "fundamental or implicit in the concept of ordered liberty." If these plaintiffs were denied any right in this connection, it was of little consequence. They were legally arrested between 11:30 a. m. to 12:30 p. m. and the last of the plaintiffs were released by 5:00 or 6:00 p. m. the same day, and most were allowed to leave City Hall around 3 o'clock. The mere fact that they were forced to stay in the city jail as opposed to being sent to the juvenile court is nothing more than an Arkansas problem in juvenile procedure and does not vio-

---

12. Actually Smith had nothing to do with the disposition of these parties after they were removed from the mob scene.

13. However, not every right guaranteed by the federal Constitution is included in the due process clause. For example, see Davis v. Burke, 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249 (1900); Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884); Moore v. Henslee, 276 F.2d 876 (8th Cir. 1960) (A state constitution allowing prosecution of a felon under information as opposed to an indictment is not a denial of due process.) Jordan v. Massachusetts, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912). (Due process does not require a trial by jury.)

late any right guaranteed by the due process clause of the Fourteenth Amendment.[14] Cf. Baxter v. Rhay, 268 F.2d 40, 43 (9th Cir. 1959); Cato v. Alvis, 288 F.2d 530, 532 (6th Cir. 1961).

 The minor plaintiffs also contend that their constitutional rights were denied because of the officers' noncompliance with Ark.Stat. § 45–225, which provides that no court or magistrate shall commit a female child under eighteen or a male child under seventeen to a jail or a police station in a county where a detention home is provided. This allegation may be answered quickly; none of the minor plaintiffs were committed by a court or magistrate.

 Many of the plaintiffs complain that they were not allowed to make bond, make a phone call, or talk to their lawyer. Considering that none of the plaintiffs could have been held more than six hours before being released on bond, and most of them were released on bond within three hours, these contentions appear to be without merit and frivolous. Not one of the plaintiffs contend that they were mistreated in any way while at the jail. As we stated earlier in this opinion, the city jail was in a state of pandemonium; these plaintiffs were only a fraction of those arrested at Fourteenth and Schiller, and the jail was literally overflowing. The officers didn't have an opportunity to allow all the people who asked to make a telephone call to do so. Further, I agree with the defendant's view that the denial of an attorney before the accused can be asked questions in regard to his identity or photographed and fingerprinted is not a deprivation of due process or any other right. See Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958).

In summary, I find that the Little Rock police under Chief Smith, facing as they did a potentially explosive situation with no assistance from other law enforcement agencies, either county or state, acted with admirable restraint and with their resolution preserved the peace and order of the City of Little Rock.

For the reasons set out above I find for the defendant and against the plaintiffs.

14. There is no contention, and the proof certainly does not show that the plaintiffs, minors or adults, have been deprived of equal protection under the law which is guaranteed by the equal protection clause of the Fourteenth Amendment.