Marian Timmerman **BYRD**, by **Harry Timmerman, Father** and **Natural Guardian, as Next Friend, Appellant,**

v.

**F. L. SEXTON et al., Appellees.**

**No. 16056.**

United States Court of Appeals
Eighth Circuit.

March 28, 1960.

Victor B. Harris, St. Louis, Mo., for appellant.

Will B. Dearing, Hillsboro, Mo., for appellees.

Before SANBORN, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This action, brought under 42 U.S. C.A. § 1983 and § 1985, concerns alleged civil rights violations committed in connection with the imposition of an $8.00 annual high school "enrollment fee"[1] which plaintiff, as a pupil, refused to pay for the school year 1955–56. Jurisdiction is based on 28 U.S.C.A. § 1343.[2] The case was tried to the court without a jury and judgment was entered dismissing the action with prejudice.

The suit was instituted March 26, 1956. Plaintiff Marian Timmerman was then 17 years of age and unmarried.[3] She had completed her freshman and sophomore high school years at Hancock High School in Lemay, St. Louis County, Missouri, and, beginning some time in 1954, she and her parents took up residence on a rural route in Washington County, Missouri. Their home there was about 10 miles southeast of the City of Sullivan in the adjoining Missouri County of Franklin. Marian attended Sullivan High School as a junior during the school year 1954–55. This was under an arrangement, in effect for some years, between the school officials of the Washington County district and the Board of Education of Consolidated District No. 2, Franklin County, whereby students living in a certain area (where plaintiff resided) of Washington County could attend high school in Sullivan rather than in Potosi, some 25 miles away.[4] Tuition and, beginning in September 1954, transportation costs were charged by the Consolidated District to the Washington County District and paid by the latter, and the Consolidated District in return provided the school facilities, instruction and bus transportation.

Defendant F. L. Sexton is the Superintendent of Schools of the Consolidated District. The other defendants involved in this appeal are the members of the Board of Education of the District.[5]

---

1. In the testimony the fee is variously described as an "enrollment fee", an "activities fee", an "incidental fee", and a "text book and activity fee." We place no particular significance on any of these appellations.

2. As that statute read prior to the additions, of no consequence here, effected in 1957 by Public Law 85–315, Part III, § 121, 71 Stat. 637.

3. Plaintiff later married and became known as Marian Timmerman Byrd. The caption of the case was duly amended.

4. Methods of pupil assignment are also prescribed by statute in Missouri, Vernon's Annotated Missouri Statutes, 1949, Vol. 11, § 165.253 and § 165.257. (§ 165.-253 was amended in minor particulars by Laws 1957, p. 481, § 1). The Washington County-Sullivan arrangement, however, was the permissible product of negotiation rather than of statutory procedure. In view of this arrangement, there is no question in this case of the propriety of plaintiff's attendance at Sullivan even though she was a resident of Washington County.

5. Also originally named as defendants were two non-member officers of the Board and the Prosecuting Attorney and the Judge of the Magistrate Court of Franklin County. Motions to dismiss the action as to these 4 persons were made prior to or during the trial and were sustained. No appeal has been taken with respect to any of these defendants.

The complaint has 2 counts. Count I is based upon § 1983.[6] It claims violation by defendants of plaintiff's federal rights "under color of" defendants' official authority.[7] Count II is based upon § 1985, presumably paragraph (3) thereof,[8] and alleges the corresponding conspiracy.[9] Actual and punitive damages

6. § 1983. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

7. Count I contains allegations as to the facts of plaintiff's attempt to attend Sullivan High School at the start of the 1955–56 school year, the refusal by the defendants to permit plaintiff to matriculate without payment of an $8.00 enrollment fee, her request for information as to the basis of the fee, her offer to pay any part thereof that included school books, her arrest and incarceration, and the lack of prosecution and dismissal of the charge against her, and further alleges that:

"13. The above described actions and conduct of defendants, and each of them, were under color of their official offices and under color of the official authority vested in them by statutes, law and regulations of the State of Missouri; were done without legal cause or justification; were unlawful, wrongful and malicious; deprived plaintiff of her right to attend without charge a public school in the State of Missouri; deprived her of the equal protection of the laws and equal rights under the laws; and deprived her of her liberty unlawfully and maliciously in violation of the laws of the State of Missouri, all in violation of the rights, privileges and immunities secured to plantiff by Amendment 14 of the Constitution of the United States.

"14. At all times herein defendants, and each of them, knew that no lawful cause or justification existed to prevent plaintiff from attending public high school at Sullivan, Missouri. Defendants knew that they had no lawful cause or justification for causing the arrest of plaintiff and detaining her in jail for two nights and approximately two days in order to prevent her from attending said public high school.

"15. The aforesaid actions of defendants in preventing plaintiff from attending public high school at Sullivan, Missouri, and in causing her arrest and detention

as aforesaid were not only illegal and unlawful, but were done with malicious and evil intent."

8. § 1985 (3). "If two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

9. Specifically Count II alleges that:

"4. At some date unknown to plaintiff but prior to September 12, 1955, defendants entered into a conspiracy to deprive plaintiff of the rights, privileges and immunities secured to her by the 14th Amendment of the Constitution of the United States and by the laws of the State of Missouri.

"5. In pursuance of said unlawful conspiracy, defendants, acting under color of their official offices and under color of the official authority vested in them by statutes, laws and regulations of the State of Missouri, illegally and unlawfully prevented plaintiff from attending the public high school at Sullivan, Missouri, and caused her to be arrested and detained in jail for a period of two nights and nearly two days.

"6. Also in pursuance of said unlawful conspiracy, defendants acting under the color of their official offices and under color of the official authority vested in them by statutes, laws and regulations of the State of Missouri, offered to drop the prosecution of peace disturbance charges against plaintiff, if she would agree not to attend said public high school at Sullivan, Missouri; although defendants well knew that plaintiff had a legal right to attend said public high school, and that there is no other free, public high school which plaintiff could attend without charge.

are asserted under both counts. The answers are general denials and they contain denials, also, that plaintiff can bring any action against the defendants under § 1983 or § 1985.

So far as the record discloses, no issue of race is in this case.

There is little dispute about the essential facts. We review them in detail here only in an attempt to reproduce the atmosphere prevailing at Sullivan in September, 1955. As stated above, Marian first attended Sullivan High School as a junior during the school year 1954–55. For that year the $8.00 enrollment fee was charged to and apparently paid by all the high school's students, residents as well as non-residents and including Marian. This fee seemingly was a matter of some concern to Marian's father for during that school year he wrote letters to the Governor and others about the charge. He had also seen Sexton, and as early as September 9, 1954, Sexton had written Timmerman in response to a letter from him, that the fee included text books and work books used during the year, admission to 5 special assemblies, admission to all basketball games except the annual tournament, a copy of the monthly school paper, and admission to Junior and Senior class plays and the annual May Day Festival. The letter also said that if it were necessary for a student to purchase his own text books, they would cost more than the $8.00 fee.

Marian's record during the 1954–55 school year was good.

On August 22, 1955, a form letter was mailed by Sexton to Marian at her home and received by her the following day. This contained enrollment information for the coming year and the requirements for graduation. It stated that the enrollment date for juniors and seniors was Thursday, September 1st, and for others Friday the 2nd; that, however, buses were to operate only on Friday; that junior and senior bus students would be accepted on Friday, if they had no transportation Thursday; that school opened Tuesday, September 6th; and that the enrollment fee for the high school was $8.00 and for the eighth grade was $2.50. The same letter was sent to all students who had attended the school the year before and made no distinction, as far as the fee was concerned, between resident and non-resident students or among any of them.

On September 2 Marian went to school by the bus. She stood in line to make out her class schedule. The teacher there asked for her receipt for the enrollment fee. She said she had no receipt and was sent to Mr. Sexton. Sexton told her that she could not attend school without paying the fee. She asked for an itemized statement and said she was willing to pay for her books. Sexton said that the books would cost more than the enrollment fee and that she would have to pay the fee. Marian had the money with her and was fully able to pay. The payment, however, was not made.

On Tuesday, September 6th, the first day of school, Marian again took the bus. She talked with the principal and said that she wanted to know where her $8.00 was going. She attended an assembly and then went to a class. She was sent from that class to Sexton's office. There she stated that this was a free public high school, that her home district had paid her tuition and bus fare and that she did not think she had to pay the enrollment fee. She then sat in Sexton's outer office the rest of the day. She rode the bus home.

The following day, September 7th, a bus did not stop for her and 2 other students. The 3 were taken to school by Marian's mother. Again she went to a class; she was told that she was trespassing but stayed in the class. After

"7. The aforesaid actions of defendants in preventing plaintiff from attending public high school at Sullivan, Missouri, and in causing her arrest and detention as aforesaid were not only illegal and unlawful but were done with malicious and evil intent."

that she went to another class and was then sent to Sexton's office where she sat until lunch and during the afternoon. On that day Sexton told Marian that even if she paid the $8.00 she could not come to that school. She went home by the bus.

That night Sexton called a special meeting of the Board of Education. The Board by formal and unanimous action determined that Marian "cannot be accepted as a student in the Sullivan High School for 1955–56" because she was not a resident of the district, because she "has refused to comply with the rules and regulations governing the school", and because she "has created a disturbance and interfered with the normal operation of the school and classroom work." A registered letter was sent by Sexton with the approval of the Board to Marian's parents on September 8th. This quoted the Board's minutes concerning that action. It also stated that "If Marian continues to appear on the campus or in the buildings it will be necessary to have her removed by an officer of the law." This apparently is the only communication, written or oral, between the Board or Sexton and Marian's parents. On Thursday and Friday, September 8th and 9th, Marian went back to school and sat in Sexton's office those two days without conversation with him.

On Monday, the 12th, she again went to the school by bus, attended a first hour class and a study hour and then was sent to Sexton's office where she sat. After lunch she went to a gymnasium class where she was not permitted to participate. She then went back to Sexton's office. Sexton felt that the situation "was having a certain effect on other students" and reported the matter to the Prosecuting Attorney. That afternoon the sheriff arrested Marian in Sexton's office for disturbance of the peace. He took her to his office in Union, Missouri. Marian attempted to reach her father by telephone from Union but was unable to do so at first. She was taken to Magistrate Court where an In-

formation against her for disturbance of the peace was read. She pleaded not guilty. Bond was set at $500. Marian was able finally to reach her father in late afternoon. No bond was posted and she remained in jail from late Monday afternoon until mid-morning Wednesday. Counsel for Marian was retained. He obtained a change of venue to Hermann, Gasconade County, Missouri. The case was dismissed there without prosecution and Marian was released.

There was publicity about these events and there are claims that this experience adversely affected Marian's disposition and nervous condition and thwarted her plans to enlist in the Women's Division of the Marine Corps.

Marian made no further attempt to attend school at Sullivan but went to Roosevelt High School in St. Louis for a few days and lived with her grandmother during that time. The officials there ascertained that her home was with her parents in Washington County and she was not allowed to continue. She finished the year back at Hancock High School in Lemay and paid tuition there.

There is some conflict in the record as to Marian's conduct while she was sitting in Sexton's office. She apparently mingled with the students as classes were changed and kept notes of conversations between office personnel and those who called at the office. There is conflict, too, as to whether on September 12th Marian took a small overnight bag to school; she and her mother deny that such a bag was taken and Sexton himself did not see one, but the arresting sheriff said she had one in her possession. Marian acknowledged that she had been warned that if she continued to come to the school she would be arrested for disturbance of the peace.

The fee in question went into the school district's incidental fund. Payments of expenses for the general operation of the school, other than teachers' salaries, were made from that fund. An enrollment fee had been charged in the Sullivan public school system for a

number of years. It was in effect prior to the election of any of the defendant board members and prior to Sexton's appointment as superintendent. It had been raised during Sexton's administration from around $6.50 to $8.00 but it had been at $8.00 for the 1954–55 school year. Sexton was unable to break the charge down among the various items for which it was said to be imposed. There was no formal requirement that students attend the assemblies, the games, the plays, or the festival, or receive or read the school paper, and failure to do these things did not deprive a pupil of his eligibility for graduation.

The trial court, in reaching its decision that the plaintiff had failed to establish a cause of action under either § 1983 or § 1985, assumed, without deciding, that, as a matter of Missouri law, the school officials had no power to require the plaintiff to pay the fee. The court felt, however, that, in order to obtain relief under the civil rights statutes, the plaintiff "must show more than that the actions of the school officials in excluding her from high school and causing her arrest were unlawful under Missouri law" and that she must show "that they were motivated to act thus by reason of plaintiff's membership in some class or group of persons which the United States has determined to protect."

The question whether the $8.00 fee violates the "gratuitous instruction" mandate of Article IX, § 1(a),[10] of the Missouri Constitution, V.A.M.S., deserves mention initially. While we might entertain some doubts, under the record in this case, about the fee's Missouri constitutional invalidity[11] and about the adequacy of the proof of its discriminatory application, its invalidity under state law is not an answer to the question whether plaintiff's federal civil rights have been violated. Mueller v. Powell, 8 Cir., 203 F.2d 797, 800. We therefore follow the example of the trial court and assume, for purposes of this opinion only and without passing upon the question, that the defendants were without power to impose or to collect the fee.

We might summarily regard this case as correctly decided below upon either of the following grounds:

1. That it is governed by this court's opinions handed down 18 years ago in Love v. Chandler, 124 F.2d 785[12] and in Blood v. Pearson, 124 F.2d 787. These were actions for damages brought under what is now § 1985 and § 1986 of 42

10. Section 1(a). "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law * * *"

11. The imposition of a fee for tuition and essential equipment has been held to be prohibited by the corresponding "gratuitous instruction" language in Article XI, § 1, of the predecessor Missouri Constitution of 1875 even in the presence of most unusual facts. State ex rel. Roberts v. Wilson, 221 Mo.App. 9, 297 S.W. 419. See also Moore v. Brinson, 170 Ga. 680, 154 S.E. 141. On the other hand the constitutional guaranty does not appear to be absolute, for it does not seem to be a bar to the collection, from his home district, of tuition for a non-resident pupil, under Vernon's Annotated Missouri Statutes § 165.253 or § 165.257, or from the pupil or his parent, as provided for by § 165.257, if the district fails to pay. Linn Consolidated High School Dist. No. 1 v. Pointer's Creek Public School District, 356 Mo. 798, 203 S.W.2d 721, 724, explaining State ex rel. Burnett v. School District, 335 Mo. 803, 74 S.W.2d 30. Furthermore, one might question whether the Sullivan enrollment fee was for "instruction", in whole or in part, or whether games, plays, the school paper and the like, are only incidental to instruction and are routine items, so long as they are kept within reasonable bounds, in American high school life.

12. Regarded as sufficiently in conflict with Hardyman v. Collins, 9 Cir., 183 F.2d 308, to warrant the granting of certiorari in that case, 340 U.S. 809, 71 S.Ct. 63, 95 L.Ed. 594. The Hardyman case was reversed by the Supreme Court, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253.

U.S.C.A.[13] It was claimed that the defendants, most of whom were officers or agents of the United States or of the State of Minnesota, had conspired to prevent, and did prevent, the plaintiff from having and holding employment under the Works Progress Administration. This court said, at page 787 of 124 F.2d:

"The appellant does not seek redress because the State of Minnesota is discriminating against him, or because its laws fail to afford him equal protection. * * * The appellant seeks damages because certain persons, as individuals, have allegedly conspired to injure him and have injured him by individual and concerted action. The wrongs allegedly suffered by the appellant are assault and battery, false imprisonment, and interference with his efforts to obtain and retain employment with the Works Progress Administration. The protection of the rights allegedly infringed and redress for the alleged wrongs are, we think within the exclusive province of the State."

The Love case has been cited with approval in at least two later opinions of this court. Moffett v. Commerce Trust Co., 187 F.2d 242, 247; Brewer v. Hoxie School District, 238 F.2d 91, 104.[14]

■ 2. That it is governed by Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, decided 16 years ago. The plaintiff there brought his action, under the statutes now before us, for damages for alleged infringement of his civil rights. He claimed that the defendants, who were members of the Illinois State Primary Canvassing Board, in violation of state law, refused to file a certificate of plaintiff's nomination in the primary as one of 2 nominees of his party for the state legislature. The court held that the plaintiff's rights under the privileges and immunities, due process, and equal protection clauses of the Fourteenth Amendment were not offended, and said, at pages 6, 7 and 8 of 321 U.S., at page 400 of 64 S.Ct.:

"The protection extended * * * by the privileges and immunities clause * * * does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law * * not every denial of a right conferred by state law involves a denial of the equal protection of the laws, * * the unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."

In the present case the claim is not that the Missouri Constitution itself operates as a violation of plaintiff's federal civil rights (a not uncommon situation typified by the segregation cases referred to below) but, instead, it is that the defendants' acts are unlawful under the Missouri Constitution, the validity of which is not attacked. Therefore, as in Snowden v. Hughes, at page 13 of 321 U.S., at page 403 of 64 S.Ct., we might conclude that the right asserted by plaintiff "is not one secured by the Fourteenth Amendment and affords no basis for a suit brought under the sections of the Civil Rights Acts relied upon * *."

Because, however, the Supreme Court, in the interval since the Love and Snowden cases were decided, has further con-

13. In prior compilations, § 1983 is found as § 43 of former Title 8 U.S.C.A., and as R.S. § 1979, and § 1985(3) is found as § 47(3) of former Title 8 U.S.C.A., and as R.S. § 1980.

14. For other cases in this court touching upon § 1983 or § 1985, see Mueller v. Powell, 203 F.2d 797, supra; Tate v. Arnold, 223 F.2d 782; Norwood v. Parenteau, 228 F.2d 148, certiorari denied 351 U.S. 955, 76 S.Ct. 852, 100 L.Ed. 1478, and Brooks v. School District, 267 F.2d 733, certiorari denied 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151. Culp v. United States, 8 Cir., 131 F.2d 93, concerns the parallel criminal statute.

sidered the statutes, because the segregation cases, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, have been stressed by the parties, because this case touches upon the educational process, and because this court in Brewer v. Hoxie School District, 238 F.2d 91, 104, affirmed the granting of relief in a case in the field of education and cited § 1985 (3) "as affording additional support to the federal jurisdiction and the issuance of the injunction", we feel that another review of pertinent cases under these statutes, particularly those of recent years, is indicated and might be helpful here.

We necessarily begin with the segregation cases. We recognize that the education of children is one of the fundamental and deep concerns of free men. And we are fully aware of the importance of education in the lives and opportunities of the youth of our nation. We heartily share with the Supreme Court its observation made, now some five and one-half years ago, in Brown v. Board of Education, supra, at page 493 of 347 U.S., at page 691 of 74 S.Ct.:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

We note also the reaffirmance of the Brown holding and the court's adherence to its stated policy in the later case of Cooper v. Aaron, 358 U.S. 1, 19–20, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5, 19, where it was said:

"It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, like all other state activity, must be exercised consistently with federal constitutional requirements as they apply to state action. The Constitution created a government dedicated to equal justice under the law. The Fourteenth Amendment embodied and emphasized that ideal. * * * Since the first Brown opinion three new Justices have come to the Court. They are at one with the Justices still on the Court who participated in that basic decision as to its correctness, and that decision is now unanimously reaffirmed. The principles announced in that decision and the obedience of the States to them, according to the command of the Constitution, are indispensable for the protection of the freedoms guaranteed by our fundamental charter for all of us. Our constitutional ideal of equal justice under the law is thus made a living truth."

It is perhaps initially to be observed that the language quoted from Brown implies certain limitations. Neither that language nor the holding itself prescribes as a *federal* right the availability of education, let alone free education, through state facilities. The opinion stands for the proposition that only "where the state has undertaken to provide it", the opportunity of an education "is a right which must be made available to all on equal terms."

We therefore look to § 1983 and § 1985 to ascertain whether they are sufficiently broad to embrace an action such as this. The answer to this question has never been an apparent or particularly easy one. The statutes at first reading appear to be broad and inclusive in their language and directed to remedies for the deprivation of "any rights, privileges or immunities secured by the Constitution and laws" or of "any right or privilege of a citizen of the United States." Nevertheless, after what we trust is a sufficiently exhaustive review of the decided cases, both in the Supreme Court and in the lower Federal courts, we conclude, as was done in the Love, Blood and Snowden cases, that these sections afford no relief for the plaintiff's alleged injuries here. We reach this result after consideration of the following:

A. The history of the statutes. These sections came into the present Code from the old Revised Statutes, § 1979 and § 1980, respectively, and those in turn had their origin in the early Civil Rights Acts, particularly the Act of April 20, 1871, 17 Stat. 13,[15] adopted soon after the Civil War to implement the then recent Thirteenth, Fourteenth and Fifteenth Amendments. They were thus designed for a specific purpose. This history and this purpose have been noted and emphasized by the Supreme Court, Hague v. C. I. O., 307 U.S. 496, 509–510, 59 S.Ct. 954, 83 L.Ed. 1423; United States v. Williams, 341 U.S. 70, 73 et seq., 88, 71 S.Ct. 581, 95 L.Ed. 758; Collins v. Hardyman, 341 U.S. 651–656, 71 S.Ct. 937, 95 L.Ed. 1253; Stefanelli v. Minard, 342 U.S. 117, 121, 72 S.Ct. 118, 96 L.Ed. 138; see Mr. Justice Roberts, dissenting, in Screws v. United States, 325 U.S. 91, 140 et seq., 65 S.Ct. 1031, 89 L.Ed. 1495, and by this court in Love v. Chandler, where it was said, at page 786 of 124 F.2d:

"The statutes which the appellant seeks to invoke were passed shortly after the Civil War to aid in the enforcement of the Thirteenth Amendment abolishing slavery, the Fourteenth Amendment prohibiting State action the effect of which would be to abridge the privileges or immunities of citizens of the United States or to deprive any person of life, liberty or property without due process or to deny any person the equal protection of the law, and the Fifteenth Amendment prohibiting the denial of the right to vote on account of race or color. * * * The statutes were intended to provide for redress against State action and primarily that which discriminated against individuals within the jurisdiction of the United States. * * * The statutes, while they granted protection to persons from conspiracies to deprive them of the rights secured by the Constitution and laws of the United States * * did not have the effect of taking into federal control the protection of private rights against invasion by individuals. * * * The protection of such rights and redress for such wrongs was left with the States. * * * " (Citations omitted.)

Inasmuch as the statutes were designed for a particular purpose, one might reasonably expect that, when the tension of those difficult times had somewhat relaxed, the use of the statutes would lessen. That, until recent years at least, seems to have been a fact. The 1st Circuit has noted this in Francis v. Lyman, 216 F.2d 583, 586, in speaking of § 1983:

"As is well known, the statute in question was originally enacted by the Congress in the turbulent days of Reconstruction. For many years the enactment remained on the books, in a somewhat dormant state; and the Congress has never taken occasion to revise or modify the statutory language substantially. It may be that this is to be explained by the fact that until re-

---

15. See also the Act of April 9, 1866, 14 Stat. 27, the Act of March 2, 1867, 14 Stat. 484, and the Act of May 31, 1870, 16 Stat. 140.

cent years resourceful plaintiffs' lawyers have not sought, in a significant number of cases, to invoke the application of the Civil Rights Act in situations far removed from those which were no doubt predominantly in the minds of the members of Congress in 1871 when they first enacted the legislation. At any rate, the Congress has sub silentio retained the act in effect, as it now appears, without substantial change, in 42 U.S.C.A. § 1983."

So, also, has the Supreme Court, Collins v. Hardyman, supra, at page 656 of 341 U.S., at page 939 of 71 S.Ct.; and see Mr. Justice Jackson's dissenting remark in Cassell v. State of Texas, 339 U.S. 282, 303, 70 S.Ct. 629, 639, 94 L.Ed. 839.

We are impressed here with the particular history and origin of these sections, with their specific original purpose and with their dormancy until recent years. All these are narrowing considerations and, in the light of the other factors hereinbelow discussed, we regard them as significant.

B. The atmosphere under which the statutes were enacted. The 1st Circuit in Francis v. Lyman, supra, at page 586 of 216 F.2d, described that time as "the turbulent days of Reconstruction." The Supreme Court, after detailed study of the Congressional records, said in United States v. Williams, supra, at page 74 of 341 U.S., at page 583 of 71 S.Ct., with respect to the parallel criminal sections:

"The dominant conditions of the Reconstruction Period were not conducive to the enactment of carefully considered and coherent legislation. Strong post-war feeling caused inadequate deliberation and led to loose and careless phrasing of laws relating to the new political issues. The sections before us are no exception. Although enacted together, they were proposed by different sponsors and hastily adopted. They received little attention in debate. * * *"

and, with respect to § 1985, in Collins v. Hardyman, at pages 656–657 of 341 U.S., at page 939 of 71 S.Ct.:

"This statutory provision has long been dormant. * * * The Act was among the last of the reconstruction legislation to be based on the 'conquered province' theory which prevailed in Congress for a period following the Civil War. * * * The Act, popularly known as the Ku Klux Act, was passed by a partisan vote in a highly inflamed atmosphere. It was preceded by spirited debate which pointed out its grave character and susceptibility to abuse, and its defects were soon realized when its execution brought about a severe reaction."

and, in Stefanelli v. Minard, supra, at page 121 of 342 U.S. at page 120 of 72 S.Ct.:

"These considerations have informed our construction of the Civil Rights Act. This Act has given rise to differences of application here. Such differences inhere in the attempt to construe the remaining fragments of a comprehensive enactment, dismembered by partial repeal and invalidity, loosely and blindly drafted in the first instance, and drawing on the whole Constitution itself for its scope and meaning."

See, also, Mr. Justice Roberts, dissenting, in Screws v. United States, supra, at page 140 of 325 U.S., at page 1054 of 65 S.Ct.

It would seem logically to follow that statutes formulated in troubled times and enacted in haste are to be interpreted broadly only with caution.

C. The statute's limited recognition in the courts. In spite of their long dormant state, § 1983 and § 1985 lately have been the subject of extensive litigation. All the cases, perhaps, cannot be reconciled and there have been strong and frequent dissents. A close examination of the cases, however, discloses that

in practice the statutes have received a narrow interpretation.

1. In the United States Supreme Court. Although the Supreme Court has made passing references to these sections as providing relief in appropriate situations,[16] and in fact has used them as a basis for granting equitable relief,[17] the instances of Supreme Court approval of damage actions brought under these statutes have been comparatively few indeed, and appear to be restricted to situations involving deprival of the right to vote because of race.[18] On the other hand, actions under the civil rights statutes have not been fruitful in a number of varying circumstances. These include not only situations where perhaps one of the influencing factors was the absence of state authority,[19] but, as well, situations where color of state law or state authority was alleged or was apparent.[20] Furthermore, even where the Court felt that the complaint established a case within the adjudicatory power of the federal courts under the statutes, or assumed that it did, it has been cautious in granting relief where to do so would interfere with state court proceedings (saving an exception where there is a "call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent"), Douglas v. City of Jeannette, supra, at page 163 of 319 U.S., at page 881 of 63 S.Ct., or where "the proper balance between the States and the federal government in law enforcement" would be affected, see Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495, and Stefanelli v. Minard, supra, at page 121

16. Ray v. Blair, 343 U.S. 214–227, 72 S.Ct. 654, 96 L.Ed. 894; O'Sullivan v. Felix, 233 U.S. 318, 323, 34 S.Ct. 596, 58 L.Ed. 980; see Mr. Justice Frankfurter's dissenting remarks in Burns v. State of Ohio, 360 U.S. 252, 262, 79 S.Ct. 1164, 1171, 3 L.Ed.2d 1209.

17. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Brown v. Board of Education, supra; Bolling v. Sharpe, supra; United States v. Raines, 80 S.Ct. 519.

18. Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349; Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, overruling Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292; and see Giles v. Harris, 189 U.S. 475, 485, 23 S.Ct. 639, 47 L.Ed. 909.

19. Bowman v. Chicago & Northwestern Railway Co., 115 U.S. 611, 6 S.Ct. 192, 29 L.Ed. 502 (refusal of defendant to carry beer into Iowa because of a prohibitory Iowa Statute); Corrigan v. Buckley, 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969 (suit to restrain violation of agreement among property owners not to convey property to a negro); Collins v. Hardyman, supra (damage action for the breaking up of a public meeting).

20. Carter v. Greenhow, 114 U.S. 317, 330, 5 S.Ct. 928, 962, 29 L.Ed. 202, 207 (damage action for refusal of defendant tax collector to accept in payment of taxes coupons tendered under an alleged contract with the State); Pleasants v. Greenhow, 114 U.S. 323, 330, 5 S.Ct. 931, 962, 29 L.Ed. 204, 207 (same); Holt v. Indiana Manufacturing Co., 176 U.S. 68, 20 S.Ct. 272, 44 L.Ed. 374 (suit to enjoin collection of taxes claimed to rest on patent rights); Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (damage action against a Governor and others for imprisonment during alleged insurrection); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (suit by members of Jehovah's Witnesses to restrain threatened criminal prosecution in state courts for violation of a city ordinance prohibiting solicitation without first procuring a license); Snowden v. Hughes, supra, (damage action for failure to certify plaintiff as a successful primary nominee); Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (damage action with respect to investigation by a committee of the California legislature); Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (action for injunction against the use in a state criminal proceeding of evidence claimed to have been obtained by an unlawful search by state police); and see Harrison v. N.A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (action for declaratory judgment as to alleged unconstitutionality of state statutes, with jurisdiction retained until the state courts were given a reasonable opportunity to construe the statutes).

of 342 U.S., at page 120 of 72 S.Ct., or until every chance has been given the state courts first to construe the challenged state statutes, Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152. These contingencies are perhaps illustrated by Mr. Justice Frankfurter's comment, concurring in Snowden v. Hughes, supra, at page 16 of 321 U.S., at page 405 of 64 S.Ct.:

"Our question is not whether a remedy is available for such illegality, but whether it is available in the first instance in a federal court. Such a problem of federal judicial control must be placed in the historic context of the relationship of the federal courts to the states, with due regard for the natural sensitiveness of the states and for the appropriate responsibility of state courts

to correct the action of lower state courts and state officials."

The criminal law counterparts of § 1983 and § 1985, namely, 18 U.S.C. § 241 and § 242, and their respective predecessor statutes and other related laws, have encountered similar limitations in the cases. These hotly contested sections have generally been held available by the court to support prosecutions of conduct which interferes with rights that flow "from substantive powers of the Federal government." [21] At the same time, the criminal statutes have been held to afford no room for prosecution of individuals for alleged violations of "rights which the Constitution merely guarantees from interference by a State." [22]

It seems to us, from all this, that the Supreme Court in its decided cases

---

21. Ex parte Yarbrough. 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (conspiracy to intimidate a negro in the exercise of his right to vote); United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (conspiracy and overt acts to interfere with a citizen's right to establish a claim under the federal homestead acts); Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (conspiracy to injure a citizen of the United States in the lawful custody of a U. S. Marshal); In re Quarles, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080, and Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (conspiracy to intimidate a citizen in the free exercise of his right to inform for violation of a federal law); Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (conspiracy to deprive negro citizens of the right to vote at a general election, the defense resting in the grandfather clause of a state constitution); United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (conspiracy by election board officers to disregard precinct returns in a congressional election); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (alteration and false counting and certification of votes in a primary election); United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (conspiracy of election officials to stuff a ballot box at an election for a U. S. Senator); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (police officers' arrest of negro for a state offense and his death by beating); Wil-

liams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (use of force by special police officer to obtain a confession from a suspect); see Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (constitutionality of a federal statute, related to the civil rights sections, authorizing removal of a criminal proceeding to Federal court when nonwhites by state statute were not permitted to act as jurors) and Ex parte State of Virginia, 100 U.S. 339, 25 L.Ed. 676 (denial of habeas corpus to state judge in custody under Federal indictment charging him for refusing to select qualified negroes as jurors). But see, also, United States v. Gradwell, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (conspiracy statute held not sufficient to support an indictment in connection with the stuffing of a congressional primary election ballot box); United States v. Bathgate, 246 U.S. 220, 38 S.Ct. 269, 62 L.Ed. 676 (conspiracy statute held not to include a conspiracy to bribe voters at a general election), and Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (motion to quash indictment sustained where there was no showing that State intended its constitutional provision limiting selection of jurors, but antedating the Fifteenth Amendment, to remain effective thereafter).

22. Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (conspiracy to prevent negroes from working or carrying out contracts to labor); United States v. Powell, 212 U.S. 564, 29 S.Ct. 690, 53 L.Ed. 653 (conspiracy on the part of

entertains a dim view toward expanding the interpretation and scope of the statutes in question, that it has construed them narrowly in the light of their initial purpose, and that there is little precedent for the plaintiff's action here. This lack of affection for the statutes has been noted by Mr. Justice Douglas, dissenting in Martin v. Creasy, 360 U.S. 219, 228, 79 S.Ct. 1034, 3 L.Ed.2d 1186, and, more specifically, in Irvine v. People of State of California, 347 U.S. 128, 152, 74 S.Ct. 381, 393, 98 L.Ed. 561, where he says, by way of footnote:

> "The current hostility towards federal actions—both criminal and civil—under the civil rights laws is further evidenced by United States v. Williams, 341 U.S. 70 [71 S.Ct. 581, 95 L.Ed. 758]; Tenney v. Brandhove, 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019]; Collins v. Hardyman, 341 U.S. 651 [71 S.Ct. 937, 95 L.Ed. 1253]; Whittington v. Johnston [5 Cir.] 201 F.2d 810, cert. denied, 346 U.S. 867 [74 S.Ct. 103, 98 L.Ed. 377]; Francis v. Crafts [1 Cir.] 203 F.2d 809, cert. denied, 346 U.S. 835 [74 S.Ct. 43, 98 L.Ed. 357]."

2. In the lower Federal courts. It would serve no useful purpose to review here all the cases decided under the statutes. It is helpful, however, to note that in these courts similar tendencies of restriction and limitation are apparent.

Judge Magruder, concurring in Cobb v. City of Malden, 1 Cir., 202 F.2d 701, at page 706, was initially troubled by the apparent breadth of § 1983, but observed:

> "This is not the first time that a court has been perplexed by the ap-

parently sweeping and unqualified language of the old Civil Rights Act. 8 U.S.C.A. § 43 seems to say that every person in official position, whether executive, legislative, or judicial, who under color of state law subjects or causes to be subjected any person to the deprivation of any rights secured by the Constitution of the United States, shall be liable in damages to the person injured. * * * Reading the language of the Act in its broadest sweep, it would seem to make no difference that the conduct of the defendants might not have been tortious at common law; for the Act, if read literally, creates a new federal tort, where all that has to be proved is that the defendants as a result of their conduct under color of state law have in fact caused harm to the plaintiff by depriving him of rights, etc., secured by the Constitution of the United States.

> "Fortunately, Tenney v. Brandhove, * * * has relieved us of the necessity of giving the Civil Rights Act such an awesome and unqualified interpretation."

He made further observations in speaking for the entire court in Francis v. Lyman, at pages 587–588 of 216 F.2d, supra:

> "When courts come to deal with a statute phrased in terms of such vague generality, they are faced with two possible alternatives: (1) They may give effect to the statute in its literal wording, and thus reach results so bizarre and startling that the legislative body would

---

a mob which seized a negro from the custody of a sheriff and lynched him); United States v. Wheeler, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270 (conspiracy to deprive citizens of their right to retain their residence in a particular state); United States v. Williams, 341 U.S. 70, 77, 71 S.Ct. 581, 95 L.Ed. 758 (conspiracy by special police officers to injure a citizen by beating him until he confessed to

a theft). See State of Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (where the same removal statute involved in Strauder v. State of West Virginia, supra, was held not available where the absence of negroes on a criminal jury was not due to specific state statute, but, if present at all, was due to. individual action), and United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588.

probably be shocked into the prompt passage of amendatory legislation. This seems to be the approach which the Third Circuit intended to take in its opinion in Picking v. Pennsylvania R. R. Co., 1945, 151 F.2d 240. (2) The courts may refuse to regard the statute as an isolated phenomenon, sticking out like a sore thumb if given a strict, literal application; and upon the contrary may conceive it to be their duty, in applying the statutory language, to fit the statute as harmoniously as may be into the familiar and generally accepted legal background, and to confine its application, within reason, to those situations which might possibly have had the approval of the Congress if it had specifically adverted to the particular cases, bearing in mind the basic purposes which gave rise to the legislation in the first place.
\* \* \*

"Where the act has been invoked in situations which no doubt were a major concern of the Reconstruction Congress—for instance, where members of a state board for the registration of voters have refused to permit the registration of a negro, acting under color of discriminatory state legislation—the Supreme Court has not been loath to impose tort liability upon such state officials under the Civil Rights Act.

\* \* \* But beyond such situations, it seems to be the tendency of the decisions to restrict the applications of the Civil Rights Act. \* \* \* "

In areas where the statutes have been acknowledged to have application, it has nevertheless been held that they are not dominant. Thus, the statutes have been held to be subordinate to the principle of judicial immunity.[23] Further, this immunity has been held available for officials in quasi judicial or even other positions,[24] and a concept of qualified immunity has emerged with respect to municipal legislative officers.[25]

In the lower federal courts, too, one finds recognition of the tendency "to avoid the appalling inflammation of delicate state-federal relationships which undoubtedly would ensue" if the civil rights statutes were too broadly construed. Francis v. Lyman, 1 Cir., supra, at page 588 of 216 F.2d. And it is repeatedly observed that the statutes are not to be utilized, in the absence of a complete breakdown of law and order, Downie v. Powers, 10 Cir., 193 F.2d 760, 765, to provide a federal forum for the redress of private wrongs, or, to put it another way, that they do not have the effect of taking into Federal control the protection of private rights against invasion by individuals. Love v. Chandler, 8 Cir., at page 786 of 124 F.2d, supra; Moffett v. Commerce Trust Co., 8 Cir., at page 247 of 187 F.2d supra; Shemai-

23. Tate v. Arnold, 8 Cir., 223 F.2d 782, 786; Francis v. Crafts, 1 Cir., 203 F.2d 809, certiorari denied 346 U.S. 835, 74 S.Ct. 43, 98 L.Ed. 357; Kenney v. Fox, 6 Cir., 232 F.2d 288, 292, certiorari denied 352 U.S. 855, 856, 77 S.Ct. 84, 1 L.Ed.2d 66; Skinner v. Nehrt, 7 Cir., 242 F.2d 573, 575; Larsen v. Gibson, 9 Cir., 267 F.2d 386-387.

24. A few examples are Kenney v. Fox, 6 Cir., 232 F.2d 288, supra (prosecuting attorney, attorney filing confinement papers and state hospital physicians); Cawley v. Warren, 7 Cir., 216 F.2d 74 (state's attorney, his assistant and grand jury foreman); Stafford v. Superior Court, 9 Cir., 272 F.2d 407 (sheriff); Agnew v. City of Compton, 9 Cir., 239

F.2d 226, 231, certiorari denied 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (police officers); Dunn v. Gazzola, 1 Cir., 216 F.2d 709 (police sergeant, reformatory superintendent and commissioner of correction); Bartlett v. Weimer, 7 Cir., 268 F.2d 860, certiorari denied 361 U.S. 938, 80 S.Ct. 380, 4 L.Ed.2d 358 (court appointed physician in commitment proceedings); Hoffman v. Halden, 9 Cir., 268 F.2d 280, 300 (jailer and hospital superintendent); Laughlin v. Rosenman, 82 U.S.App.D.C. 164, 163 F.2d 838 (assistant to the President and Special Assistant Attorney General).

25. Cobb v. City of Malden, 1 Cir., supra, at page 707 of 202 F.2d; Nelson v. Knox, 6 Cir., 256 F.2d 312, 315.

tis v. Froemke, 7 Cir., 189 F.2d 963; Bottone v. Lindsley, 10 Cir., 170 F.2d 705, 707, certiorari denied 336 U.S. 944, 69 S.Ct. 810, 93 L.Ed. 1101. Instead, the protection of such rights and redress for such wrongs is left with the state.

In addition, the general attitude of the federal courts towards actions under these sections can be gleaned from the following: One's "subjection to the necessity of having to stand trial on an unfounded charge did not alone constitute a deprivation of any right, etc., secured by the Constitution of the United States." Dunn v. Gazzola, 1 Cir., at page 711 of 216 F.2d, supra. "The Civil Rights Acts were enacted to protect the civil rights of individuals, and not to discipline local law enforcement officers for acts that are later corrected. * * * The common law provides adequate actions for damages against errant law enforcement officials." Jennings v. Nester, 7 Cir., 217 F.2d 153, 155, certiorari denied 349 U.S. 958, 75 S.Ct. 888, 99 L.Ed. 1281. "The right not to have private individuals swear falsely in a state court is not a right secured by the Federal Constitution", Bartlett v. Weimer, 7 Cir., at page 862 of 268 F.2d, supra. "The right of employment, and its redress when invaded, is exclusively within the domain of the state. It is not a federal civil right." Ferrer v. Fronton Exhibition Co., 5 Cir., 188 F.2d 954, 956. An allegation that "the defendants acted willfully and maliciously * * * adds no strength to the complaint under" the Civil Rights Act. Whittington v. Johnston, 5 Cir., 201 F.2d 810, 812, certiorari denied 346 U.S. 867, 74 S.Ct. 103, 98 L.Ed. 377.

These lower federal cases cited are only a sample. But they, quite naturally, display the same trends toward restriction and limitation of § 1983 and § 1985 as we feel are illustrated by the opinions of the Supreme Court which have been outlined in detail.

This review of the Supreme Court and other cases lends no encouragement to any theory that today's civil rights statutes afford the answer to plaintiff's claims. As was said, in United States v. Williams, at page 81 of 341 U.S. at page 587 of 71 S.Ct. supra, "The uses to which a statute has been put are strong evidence of the ends it was intended to serve."

If we may use the figure of speech employed in Francis v. Lyman, 1 Cir., at page 588 of 216 F.2d, supra, our feel for the "gloss put upon the statute by the controlling decisions" leads us to the conclusion that the trial court's judgment dismissing the action was correct. This is so (1) because, as in Snowden v. Hughes, supra, plaintiff here claims no invalidity of state law or of state constitutional provision but at the most complains of acts said to be improper under the Missouri Constitution, (2) because, as in Love v. Chandler, supra, plaintiff's cause of action, if there be one, is for invasion of personal rights for which state laws and state forums provide the avenue of relief, and (3) because the decisions which have been promulgated, both before and since those cases were decided, seem to us clearly to outline a specific and narrow area of applicability of the statutes and one which the plaintiff's case does not reach. At least, we so interpret the statutes until the Congress broadens them or until the Supreme Court tells us otherwise.

The judgment is affirmed.